## Hufsmith's Estate.

1. Hufsmith conveyed land to each of four sons, with agreements that from the consideration was to be deducted " such sum as will amount to one equal share with the other children of the whole estate of the said Hufsmith which shall be at the time of his decease." The consideration was to be paid in annual instalments, the first to be made in one year after his death. Hufsmith died, leaving eight children and the children of two others, and by his will dated after the conveyances, directed his estate to be divided "amongst my children," naming eight, and further, "that an equal share is also to be paid to the heirs of my deceased daughter Julianna;" he left nothing to the children of the tenth. *Held*, that the estate including the purchase-money of the land was to be distributed under the will into nine parts, and the purchase-money due by the four sons to be deducted from their shares respectively.

2. The intention of the agreements was that the whole purchase-money should fall as assets into his executor's hands, and the shares of the sons to be deducted at his death.

3. The contract share and the will share were the same.

March 24th 1870.　Before Thompson, C. J., Agnew, Sharswood and Williams, JJ.　Read, J., at Nisi Prius.

Appeals from the decree of the Orphans' Court of *Monroe county*, in Adam Hufsmith's Estate: Nos. 243, 244, 245, 246, to January Term 1870.

Adam Hufsmith being the owner of a large quantity of real estate, in 1817 entered into articles of agreement for the sale of separate tracts to each of his three sons Adam, Peter and Jacob, for sums named in the articles. On the 14th of August 1821, by other articles with the same sons, he modified the contract; the material parts of the latter articles with Peter, are as following :—

" Whereas by an agreement in writing bearing date the twelfth day of June, Anno Domini one thousand eight hundred and seventeen, the said Adam Hoofsmith agreed to convey to the said Peter Hoofsmith a certain messuage and tenement and tract of land situate in Chestnuthill township aforesaid, containing one hundred and thirty-three acres and ninety-seven perches, for which the said Peter Hoofsmith covenanted and agreed to pay to the executors, administrator or assigns of the said Adam Hoofsmith after his decease the sum of two thousand dollars in the manner and form therein mentioned. It is therefore now agreed by and between the parties, that in consideration of the pressure of the times and the price of lands being greatly reduced, that the said Peter Hoofsmith shall pay no more than one thousand four hundred and sixty-seven dollars, first deducting therefrom such sum as will amount to one equal share with the other children of the whole of the estate of the said Adam Hoofsmith which shall be at the time of his decease, and it is also agreed that instead of paying one hundred dollars a year the said Peter Hoofsmith shall pay but sixty dollars a year, the first payment to be one year after the decease of said Adam Hoofsmith,

[Hufsmith's Estate.]

and the said Peter Hoofsmith, his heirs and assigns, shall give the said Adam Hoofsmith twenty dollars' worth of grain each and every year during his life."

The consideration of Jacob's tract was to be $1800. The other stipulations were the same as Peter's. The consideration of Adam's tract was to be $869. The other stipulations were the same except that the provision as to his share of his father's estate was " deducting therefrom such sum as will amount to one equal child's share of the whole estate of the said Adam Hufsmith, Sen., which shall be at the time of his decease, in manner following, to wit: Seventy dollars per annum till the whole is paid, the first payment being due one year after the decease of the said Adam Hoofsmith, Sen." On the 3d of March 1837, Adam Hufsmith made a similar agreement with his son Philip for another tract, for the consideration of $2314.78; the stipulation as to his share was the same as that with Adam, and he was to pay $150 per annum till the whole should be paid, the first payment being due in one year after the father's death. Deeds were made to the sons for their respective tracts on the day of executing the agreements subject to the stipulations contained in them. Adam became insolvent and died before his father—his land was sold by the sheriff to James Smith.

Adam Hufsmith by his will, dated January 23d 1843, and proved October 21st 1850, directed as follows:—

" Secondly that give to my *loveing* wife if she should *excead* me in life all such liberty and stipulation as *specifide* in an greement made her before marriage. Thirdly is my will that after my *deceass* all my real and personal estate shall be inventoried or appraised and sold by my executors by public or *privit* sale at their *discreation* and the money arising therefrom shall be divided equally divided amongst children namely to my sons Peter Jacob and Philip also to my daughter Margrate now widow, Elizabeth intermarried with Davalt Fisher, my daughter Mary intermarried with Henry Weiss—my daughter *Eave* intermarried with Peter Serfass, my daughter Catharine intermarried with Michael Lilly or *there* heirs. It my further my will that equal share is also paid to the heirs of my deceased daughter *Jullanna* who was intermarried with Charles Haney except *shuch* amount as the said Charles H. Heaney shall be indebted to my estate shall be deducted therefrom. I also give and bequeath to Elizabeth Hufsmith who was intermarried with my deceased son Adam Hufsmith the sum of One dollar for the full share of my—Adam."

Letters testamentary were granted to his sons, Peter and Jacob Hufsmith, the executors named in the will.

The sons and the purchaser at sheriff's sale of Adam's share made payments on account of the purchase-money of their tracts. On the 22d of November 1867 Peter Hufsmith, the surviving

executor, filed a final administration account—four partial accounts having been previously filed. In these accounts the executors charged themselves with the whole purchase-money—what remained unpaid and also the several sums theretofore received from the sons on account of the purchase-money of their tracts of land. The balance appearing on the final account for distribution was $8321.27. This was referred to Thomas M. McIlhany, Esq., as auditor for distribution. After deducting certain errors and the expenses of the audit, the balance was reduced to $8215.02. The auditor reported that this balance should be divided into ten parts—the number of children of the testator—in order to ascertain "one equal child's share," according to the articles of agreement; which upon this theory would make the aggregate shares of the four brothers $3286. He reported that this sum should be deducted from the whole balance appearing for distribution, which would leave $4929.02, which he reported should be distributed under the will. To this he added advancements to Eve and the husband of Julianna, and found that each of the nine children would be entitled, under the will, to $580.87. According to this mode of distribution each of the four sons would receive from the whole estate of the testator $1402.37 ; whilst the other children would each receive only $580.87. The other children filed the following exceptions to the report :—

1. The auditor erred in distributing to Jacob Hufsmith, Peter Hufsmith and Philip Hufsmith, each $580.87, in addition to the $821.50 allowed each of them on their respective agreements with the testator, distributing to the six daughters of testator each only $580.87.

2. The auditor should have divided the whole estate, including the balances due and unpaid on the four agreements with testator's four sons, into ten equal shares, and distributed one such share to each of the testator's six daughters named in the will.

After hearing the exceptions the court recommitted the report to the auditor, with instructions to make distribution by computing the whole of the estate, ascertaining a child's share, and distributing the amount equally among those who, under the will, are entitled to equal distribution. To be done without regard to the agreements between the three sons and Adam Hufsmith in his lifetime.

In his second report, the auditor found the whole amount for distribution, after deducting the expenses of the audit, to be $8500.83, which, after deducting one dollar, the legacy to Adam's widow, he divided into nine shares amongst the other children and their representatives, and reported in detail the amount due to each after deducting their respective indebtedness to the estate.

Exceptions on behalf of the four sons were filed to this report. On the 27th of May 1869, the court dismissed the exceptions

and confirmed the report.    Appeals were taken to the Supreme Court on behalf of the four sons, and the decree of confirmation assigned for error.

*W. Davis* and *M. H. Jones*, for appellants.—It was not said that the money to be deducted under the agreements was an advancement, and it cannot so be presumed : Kreider *v.* Boyer, 10 Watts 54.    The share, therefore, must be taken to be designed as that under the intestate laws.    If these agreements had been mentioned in the will, and there was a bequest of the residue, this would have been in addition : Leidich *v.* Leidich, 8 W. & S. 363.    They referred also to 2 Williams on Ex'rs. 746, 820 ; Balliett's Appeal, 2 Harris 460 ; Witman *v.* Lex, 17 S. & R. 90.

*S. S. Dreher*, for appellees, cited Weber's Appeal, 5 Harris 474 ; Schneider's Appeal, 4 Id. 407.

The opinion of the court was delivered, March 31st 1870, by

AGNEW, J.—The articles between Adam Hufsmith and his sons Peter, Jacob, Adam and Philip, evince his intentions as to their shares of his estate.    He sold his lands to these sons severally for a large price, not payable until after his death.    The whole purchase-money was therefore intended to fall as assets into the hands of his executor or administrator.    Then, as an inducement to his sons to buy, he provided that their shares of his estate at his death should not be paid by them, but be deducted from the purchase-money.    This was to be their security not only for a share of his estate, but also for the proportion each should receive. Looking at the time when payment of the price of the lands was to begin, to wit, one year after his decease, and the provision for the share to be then first deducted, there can be no doubt of Adam Hufsmith's intention that this sum so deducted after his death, should be the share each one was then to receive of the entire estate.    The language is peculiar : "first deducting therefrom such sum as will amount to one *equal* share with the *other children* of the *whole* of the estate of the said Adam Hufsmith, which shall be at *the time* of his *decease*."

This clear intent of Adam Hufsmith to suffer the price of his lands to fall into his estate at his death, and then, and not till then, to deduct the equal shares in his whole estate of these sons, must prevail, unless by his will he has plainly made a different distribution.    An intent so rational, so just, and so firmly imbedded in the contracts should not be displaced by anything less than a clear and certain intent in the will to the contrary.    We must therefore ascertain whether his will exhibits a different intent.

What good reason had he for making a will ?    The purpose

appears on its face.  He wished to enforce the marriage settlement with his wife, and hence she takes nothing more under the will.  He desired to subject the portion of the children of his deceased daughter Juliana to the debt of their father Charles H. Heaney; and also to cut off the family of his deceased son Adam, who had not done well, and had suffered the land, embracing his share, to be sold at sheriff's sale.  But when he had done these things his purpose stops, and upon reaching the shares of the other children, we find no intent different from that exhibited in the contracts, and on the contrary a disposition of his estate precisely accordant, and identical with the contract provision.  Thus, he says, thirdly, "it is my will that after my decease *all* my real and personal estate shall be inventoried or appraised and sold by my executors by public or private sale at their discretion, and the money arising therefrom shall be equally divided amongst my children, namely," &c.  Thus the testator, aware that by the contracts the purchase-money of his lands fell into and constituted a part of his distributable estate at his decease, by his will grasped precisely the same entirety, including also the debt due by Juliana's husband, and divided it equally among all his children, excepting Adam, who was then dead, and whose share had been expunged by the sheriff's sale.  It was the failure to perceive this entire coincidence between the contracts and the will in the evident *post mortem* distribution of the then whole estate contemplated by both, which led to this litigation.  The error is in presupposing an intention to prefer sons to daughters not found either in the contracts or the will.  But when we discover that the purchase-money of the contracts, by reason of the time fixed for payment necessarily fell into the estate as an entirety, before an equal share could be ascertained, and that by the will as well as the contracts the equal shares were to proceed from the *whole* estate existing at his decease, we perceive that the equal share of the contract and of the will are identical, and one cannot be superadded to the other.  The provision of the contract was but a mode of securing to the sons as purchasers the retention of their shares in a specified proportion.  In order to add the portion of the will to that of the contracts we must cast out the equal shares of the contracts from the whole estate remaining at his death, and then divide the same entirety of estate equally under the will, a matter clearly impossible.  In other words, it is the same whole or entire estate which is to be divided at death under the will and under the contract.  It can therefore be divided only into equal portions, so that the contract-share and will-share are one and the same thing; the purchase-money not being payable until a year after Adam's death, and the shares (not till then deducted), being an equal proportion of the then whole estate.

The distribution made by the auditor and approved by the court

15 P. F. Smith—10

[Hufsmith's Estate.]

was therefore right, and the decree of the Orphans' Court is affirmed, the record ordered to be remitted, and distribution to be made accordingly, and the costs paid by the appellants.

THOMPSON, C. J., dissented.